IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MAGICAL FARMS, INC., et al. | ) | CASE NO. 1:03CV2054 |
| | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| Plaintiffs, | ) | |
| | ) | **PLAINTIFFS, MAGICAL FARMS, INC.** |
| vs. | ) | **AND MAJESTIC MEADOWS** |
| | ) | **ALPACAS, INC.'S TRIAL BRIEF** |
| LAND O'LAKES, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

Pursuant to this Court's standing Trial Order, Plaintiffs Magical Farms, Inc. ("Magical Farms") and Majestic Meadows Alpacas, Inc. ("Majestic Meadows") submit the following as their Trial Brief:

## I.    Introduction.

Magical Farms and Majestic Meadows are two alpaca farms in Medina County that have suffered millions of dollars in damages as a result of the conduct of Defendants Land O'Lakes, Inc. and Land O'Lakes Farmland Feed LLC (collectively, "LOL"). LOL, violating its own quality assurance policies, manufactured alpaca feed in the same plant that it made chicken feed. An antibiotic called salinomycin should have gone into a batch of chicken feed but instead was placed into the alpaca feed, which was purchased by Plaintiffs.

One hundred twenty four of Plaintiffs' alpacas died, and 318 more ate the feed but survived. Although Defendants repeatedly attempt to make this into a personal injury case, it is in fact a property damage case. The fact that Plaintiffs' alpacas consumed the poisonous feed injured Plaintiffs' property—some alpacas were destroyed completely and others lost their value in a finicky and educated alpaca market.

Although LOL (1) knew even before this incident that salinomycin was highly toxic to alpacas, (2) knew within days of the animals beginning to die in mid-March of 2003 that the cause was its feed, and the presence of salinomycin in its feed, LOL denied in its pleadings and discovery responses that its product contained salinomycin and that salinomycin was toxic to alpacas. LOL has, only three weeks before trial, finally admitted these facts that it knew long ago.[1] Plaintiffs note that they are still determining how to address these belated admissions, and it may be that some of the testimony and evidence that Plaintiffs list below and in the referenced exhibit list need not be introduced at trial. Plaintiffs also note that, given their pending Renewed Motion for Reconsideration, Plaintiffs' discussion of witnesses and list of exhibits include materials that pertain to punitive damages.

## II. Statement of Facts.

Magical Farms and Majestic Meadows are alpaca farms located in Northeastern Ohio. Magical Farms is one of the largest alpaca farms in the United States, owned by Libby and Jerry Forstner and operated by Jerry's sons, Trip and Ty Forstner. Magical is located in Litchfield, Ohio on a farm of approximately 250 acres and has operated exclusively as an alpaca farm since 1995. Over 1,500 alpacas are maintained at Magical Farms by 20 employees.

Majestic Meadows is also located in Litchfield, Ohio, but it is a small family business, owned and operated since 1994 by Jeff and Faye Farley, with help from their three young children. It consists of approximately 20 acres and 60 alpacas.

Alpacas are native to the Andes Mountains in Peru and Bolivia. They are a species of camelid related to vicuna and llama. Alpaca are valued for their exquisite fleece which comes in a variety of colors from pure white to jet black and is used for producing high quality apparel.

---

[1] Plaintiffs will be filing a motion to recover the vast fees incurred as a result of Land O'Lakes

Alpacas began to be imported into the United States in the late 1980s.  Alpaca breeders began a registry system called the Alpaca Registry, Inc. ("ARI") in order to register the genealogy of alpacas in the United States and to assure that registered alpacas are purebred.  In 1998, on a vote of its members, the ARI registry was closed, so that only the offspring of registered alpacas could be registered with ARI.

The Defendants in this case are Land O'Lakes, Inc. and its wholly-owned subsidiary, Land O'Lakes Farmland Feed.  Land O'Lakes, Inc. is a $25 billion per year diversified food company.  Its feed division produces animal feed for all sorts of livestock and pets in plants located throughout the United States.  One of LOL's plants is located in Massillon, Ohio.

In 2003, the Massillon plant's primary product was chicken feed.  The chicken feed produced at LOL's Massillon plant contains an antibiotic called salinomycin.  Salinomycin is one of a group of chemicals known as ionophores.  Many animals, including alpacas, cannot tolerate ionophores.  Salinomycin and other sorts of ionophores are poisonous to alpacas.

The sensitivity of many animals to ionophores was well known to LOL.  In fact, the LOL Quality Assurance Manual prohibited ionophores from even being present in feed plants which produced feed for ionophore-sensitive animals.  Unfortunately, the Massillon LOL plant totally ignored LOL's own requirement.  If, as representatives of LOL have acknowledged, LOL had abided by its Quality Assurance Manual, this incident never would have occurred.

As was inevitable, on February 28, 2003, salinomycin intended for inclusion in a batch of chicken feed was instead mixed into a batch of LOL alpaca feed marketed as "Dr. Evans Profile Brand" produced at Massillon.  The alpaca feed containing the deadly salinomycin was identified as "03 Feb 28 MAS".

---

utterly unwarranted failure to make these admissions over three years ago.

Both Magical Farms and Majestic Meadows purchased bags of the poisoned feed and fed it to their animals. All of Majestic Meadows animals ate the salinomycin-laced LOL feeds and about of 400 of Magical Farms' animals in specific pastures ate the tainted feed.

In mid-March, 2003, the tragedy began at both Magical Farms and Majestic Meadows (and at some six other farms that were the unfortunate purchasers of LOL's tainted feed). Animals began to demonstrate symptoms that had never been seen before in alpacas in Northeastern Ohio. The animals' evidenced unsteadiness, muscle weakness, lethargy, labored breathing, were unable to hold up their heads, and secreted fluids from their eyes and mouths. The condition of the poisoned animals gradually debilitated into a total inability to stand and move and, ultimately, to death.

The first of Magical Farms' animals died on March 17, 2003. Plaintiffs sent some of their sick and deceased animals to the Ohio State University School of Veterinary Medicine where Dr. David Anderson, a professor at Ohio State University and the Director of the Camelid Institute, tested the animals. The feed that they had been eating was also tested. At Magical Farms and Majestic Meadows, Dr. Denise Stoll, a veterinarian who specializes in alpaca care did her best to care for the scores of desperately ill and dying animals.

By March 18, 2003, Magical Farms had lost 20 alpacas with 10 others in very poor condition. Magical Farms notified LOL of a possible toxicity problem. An additional 15 animals died at Magical Farms on March 19th. On March 21st, LOL confirmed that salinomycin had been found in feed produced at its Massillon plant. On that date, LOL sent a letter from its Director of Feed Manufacturing to its feed customers acknowledging that, "Preliminary lab analysis has indicated the presence of salinomycin, an ionophore toxic to alpacas, in a single sample of Profile Dr. Evans alpaca supplement." The LOL letter of March 21, 2003 also

informed its customers that LOL was recalling the production run of Dr. Evans feed with the code 3 Feb 28 MAS.

Although the cause was identified and the recall of the deadly feed initiated, the effects of the salinomycin-laced feed continued unabated. By March 21, 2003, Magical had lost 56 animals with more animals showing symptoms of salinomycin poisoning. The animals were dying literally faster than they could be buried. On March 28, 2003, LOL informed its customers that it was discontinuing manufacture of Dr. Evans alpaca supplement at the Massillon plant, and that it had shifted production to its ionophore-free plant in Richmond, Indiana. By Friday, March 28, 2003, Magical Farms had lost 83 animals and Majestic Meadows two. Finally, in late March, 2003, the rate of death began to slow. In early April, 2003, LOL distributed free of charge to its customers an experimental alpaca supplement designed to aid in the healing process for those animals which had survived eating the poison feed.

Ultimately, Magical Farms lost 120 animals to the salinomycin-tainted feed and Majestic Meadows lost four. Magical Farms had 292 animals which were poisoned by the feed, but survived. Majestic Meadows had four animals killed and 26 animals which were poisoned, but did not die. Although the head veterinarian at LOL opined to the Forstners that the insertion of the salinomycin into the alpaca feed was a deliberate act, no one was ever held accountable for this debacle at LOL. No one was disciplined, no one was reprimanded, no one was fired.

LOL did no follow-up investigation on the long-term effect of salinomycin poisoning on alpacas, and in fact refused to fund a request by Dr. David Anderson of Ohio State University to perform such a long-term effect investigation. LOL provided no claims assistance to any of its customers who suffered damages as a result of the salinomycin contamination. In fact, the evidence will show that the only claim for a dead animal which was paid by LOL without a

lawsuit having been filed was to the man who later agreed to become their expert witness, Anthony Stachowski.

Both Magical Farms and Majestic Meadows are well known in the alpaca industry for raising superior quality animals. Some of the animals which were killed at Magical Farms were considered to be the top herd sires in the United States.

The 120 animals belonging to Magical Farms which died as a result of salinomycin poisoning have been valued by Michael Safely ("Safely"), perhaps the leading alpaca expert in the world, at $6,432,000. Safely valued the four animals lost by Majestic Meadows at $165,000.

In addition, as a result of their diminished condition, having been poisoned by salinomycin, the surviving animals have suffered a precipitous diminution in value. Mr. Safely will testify that the 292 surviving animals at Magical Farms have been reduced in value immediately after the poisoning by $7,848,857 and that the 26 surviving animals at Majestic Meadows have been reduced in value by $542,900. In light of Majestic's entire herd being poisoned, Majestic also seeks farm loss damages.

LOL has no evidence to contradict Plaintiffs' evidence of damages. LOL has no expert opinion to offer relating to the diminution in value of the surviving animals. LOL has no expert who has opined that the surviving animals have not diminished in value. LOL's appraiser evaluated only 80 of the 124 deceased animals.

In addition, Plaintiffs will present evidence that they have incurred veterinary and other expenses in excess of $500,000 resulting from the salinomycin poisoning. Again, LOL has no evidence to contradict these damages of Plaintiffs.

In summary, the evidence will show that LOL caused Plaintiffs damages of approximately $15 million as a result of killing 124 of their animals and injuring 318 others. The

evidence will show that Plaintiffs' injuries directly resulted from LOL's negligence and its reckless disregard of Plaintiffs' rights by failing to comply with its own safety requirements. Although LOL knew salinomycin was a deadly poison to alpacas which should not have even been present in the Massillon plant where the deadly feed was mixed, they disregarded their own rules and caused what LOL's own witnesses have admitted is the worst feed disaster in the history of LOL.

### III.   Statement of Controlling Law on Anticipated Legal Issues.

#### A.   Real party in interest.

Plaintiffs are the real parties in interest with respect to this dispute. Federal Rule of Civil Procedure 17(a), "Real Party in Interest" provides, in pertinent part:

> Every action shall be prosecuted in the name of the real party in interest . . . . No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commence of the action by, or joinder or substitution of, the real party of interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Plaintiffs are the real parties in interest in this case as they own or were assigned rights to every animal at issue in this case. Defendants have argued, and may again, that Plaintiffs are not the "owners" of the animals because the certificates registering the animals with Alpaca Registry, Inc. do not clearly show Plaintiffs as the entity under the section of such certificates indicating "owner."

In Ohio, animal ownership is not proven simply by a registration certificate; rather, courts look at all the facts surrounding an animal to determine ownership. *See, e.g. Long v. Noah's Lost Ark, Inc.*, 814 N.E.2d 555, 158 Ohio App.3d 206 (Ct. App. 2004)(acknowledging that the trial court determined ownership of animals through testimony, contributions to purchase price,

purchase agreements and other documents); *Hartwig v. Robinson*, No. 15-97-03, 1997 WL 619790 (Ct. App. Ohio Oct. 9, 1997)(acknowledging that the trial court determined ownership of an animal by testimony on the "extended amount of time" spent by the animal at defendant's residence)(App. C); *accord, Calumet Farm, Inc. v. Allen,* 46 Fed. Appx. 300 (6th Cir. 2002)(acknowledging that the trial court determined ownership of animals through testimony, bills of sale, "reconveyance contracts," collection of insurance, and who kept the proceeds from the sale of offspring)(applying Kentucky law).

With the exception of rights that have been assigned to Plaintiffs (discussed below), Plaintiffs (either individually or, in some cases, jointly) owned alpacas that died, and currently own alpacas that were damaged after ingesting LOL's poisonous alpaca feed supplement. With respect to Magical Farms' animals, the certificates themselves, along with the testimony of Libby Forstner and Tripp Forstner, who have personal knowledge of the information provided by Magical Farms regarding the Certificates, verify this fact. There is no contrary evidence. Likewise, Majestic Meadows also owned alpacas that died, or that were permanently harmed, as a result of ingesting LOL's contaminated alpaca feed supplement, as demonstrated through the relevant certificates and the undisputed testimony of Jeff and Faye Farley.

**B.     Assignments.**

Magical Farms is a real party of interest with respect to any animal as to which it received an assignment, including as to animals owned by Libby Forstner which, incidentally, were assigned to Magical Farms prior to the running of any relevant statute of limitations to her claims. *See, e.g., Fred L. Gray Co. v. Dubuque Stone Products Co.*, 356 F.2d 718 (8th Dist. (IA) 1996)(holding that an insurance agent that was not a party to a contract between an insurance company and the defendant insured was nevertheless a real party in interest, notwithstanding the

fact that the assignment was made after the filing of the lawsuit, because defendant insured failed to show prejudice*); Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.*, No. Civ. 02-213 JRT/FLN, 2004 WL 1447921 (D.C. Minn. June 28, 2004); *The Decorative Center of Houston, L.P. v. Direct Response Publications, Inc.*, 264 F. Supp.2d 535 (S.D. Texas 2003); *Heath Cost Controls of Illinois, Inc. v. Washington*, No. 95 C 3806, 1997 WL 461077 (N.D. Ill. Aug. 8, 1997).

A plaintiff is a real party of interest as to claims that have been assigned to it, even it the assignment occurs after it files a lawsuit based upon such assigned claims, absent a showing of prejudice by the defendant. *See, e.g., Fred L. Gray Co. v. Dubuque Stone Products Co.*, 356 F.2d 718 (8th Dist. 1996)(holding that an insurance agent that was not a party to a contract between an insurance company and an insured was nevertheless a real party in interest in bringing his claim against the insured, notwithstanding the fact that his assignment of the insurance company's claims against the insured was made after the filing of its lawsuit); *accord, Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.*, No. Civ. 02-213 JRT/FLN, 2004 WL 1447921 *10 (D.C. Minn. June 28, 2004)(acknowledging that "an assignment is not rendered ineffective simply because it was made after filing a lawsuit" and an "assignment [is] effective if made after filing [of a complaint], but before trial where no prejudice to defendant."); *The Decorative Center of Houston, L.P. v. Direct Response Publications, Inc.*, 264 F. Supp.2d 535, 543—544 (S.D. Texas 2003)(acknowledging that a plaintiff that brings a claim prior to actually receiving assignment of the claim is nonetheless a real party of interest); *Heath Cost Controls of Illinois, Inc. v. Washington*, No. 95 C 3806, 1997 WL 461077 (N.D. Ill. Aug. 8, 1997)(stating that "[a]lthough Rule 17(a) does not explicitly address the issue of the timeliness of an assignment, courts in construing the rule have held that even when the claim is not assigned until

after the action has been instituted the assignee is the real party in interest and can maintain the action.")(citing *Bank of St. Louis v. Morissey*, 442 F. Supp. 527 (E.D. Mo. 1978), *Kilbourn v. Western Surety Co.*, 187 F.2d 567, 571 (10th Cir. 1951), *Infodek, Inc. v. Meredith-Webb Printing Co.*, 830 F. Supp. 614, 620 (N.D. Ga. 1993).

In this case, LOL moved for summary judgment <u>almost two years ago</u> on the issue of Magical's right to prosecute claims relating to various animals. (ECF # 77). In connection with that motion, LOL expressly raised the issue of Magical's ability to prosecute claims for animals owned wholly by Libby Forstner. (ECF #91)("This assignment [by Libby Forstner] deals with 24 alpaca owned by Ms. Forstner and clearly establishes that the animals listed in exhibit 'A' to the Assignment are not the property of the Plaintiffs.");(ECF #84 pp. 6-7)("These animals all have registration documentation showing Ms. Forstner to be their sole owner.") LOL's motion was denied, and the Court found that the issue of ownership should proceed to the jury. (ECF #115).

Prior to the Court's denial of LOL's motion, Plaintiffs had filed a motion seeking leave to amend the complaint <u>if</u> LOL was correct as a matter of law that Plaintiffs lacked standing. (ECF #111). Because LOL's motion for summary judgment was denied, Plaintiffs' motion to amend became moot. The Court subsequently denied Plaintiffs' motion to amend. (Non-document order, 1/4/06). The "assignment" issue has been disposed of, subject to Plaintiffs producing evidence of the assignments and other evidence of ownership for each animal at trial.

### C. Causation.

If Defendants' admissions concerning negligence are valid, the theories of liability, whether under the pleaded negligence, strict product liability, or negligence *per se* all generally will require proof of causation. Proximate cause is met "where an original act is wrongful or

negligent and in a natural and continuous sequence produces a result which would not have taken place without the act." *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287, 423 N.E.2d 467, 471 (1981). Plaintiff's evidence "must be such that a trier of fact may reasonably determine that it is more likely than not that the defendant's negligence was the cause of the plaintiff's injury." *Stone v. Davis*, 66 Ohio St.2d 74, 82, 419 N.E.2d 1094, 1099 (1981)

### D.      Standard for damages.

Despite LOL's repeated insistence that Plaintiffs are bringing a case that requires proof of medical damage to their alpacas, Plaintiffs are not seeking to recover for the pain and suffering to their animals as a result of having been poisoned by LOL, but rather are seeking to recover the diminished value of those animals. *See, e.g., Bishop v. East Ohio Gas Co.*, 143 Ohio St.3d 541, 546, 56 N.E.2d 164, 166 (1944)(noting that market value is the standard for direct property loss); *McDonald v. Ohio State Univ. Veterinary Hosp.*, 67 Ohio Misc.2d 40, 42, 644 N.E.2d 750, 752 (same). This Court has already ruled, in response to LOL's motion for summary judgment as to causation (ECF # 97) that, while any damages claimed for "disability" of the animals requires medical evidence (ECF #255 at p. 5), "[i]f the damages alleged are the loss of the value of personal property, then evidence of fair market value is appropriate and admissible." (ECF #255 at p. 7)(emphasis added.)

### E.      Punitive damages.

Plaintiffs believe that the Court erred in its findings that Plaintiffs are not entitled to punitive damages based on LOL's conscious disregard for Plaintiffs' property. Plaintiffs' Renewed Motion for Reconsideration is pending.

IV.    **Proposed Witnesses.**

Plaintiffs reserve the right to call every witness disclosed on their Rule 26(a)(3) disclosures. The witnesses that will likely be called, and a brief description of testimony to be elicited, follows:

- Jeff Workman:  Testimony regarding presence of salinomycin in the feed, regarding Quality Assurance Manual existence and provisions, written exception requirement, lack of knowledge of quality assurance measures, use of salinomycin at the Massillon plant was a direct violation of the policy against using such a drug where alpaca feed was produced, failure to sample as required by policy, feed contamination/mixing problems, lack of any testing procedures to ensure that the guarantee on the bag is met, process of mixing feed, and other issues addressed in his deposition.

- Gary Hauenstein:  Testimony regarding lack of training in quality assurance/drug handling, presence of salinomycin in the feed, ionophore free plants, Quality Assurance Manual existence and nature of its provisions, lack of knowledge of quality assurance measures, lack of written exception permitting use of salinomycin at the Massillon plant, feed contamination/mixing problems, failure to sample as required by policy, lack of any testing procedures to ensure that the guarantee on the bag is met, process of mixing feed, investigation and cause of salinomycin going into the alpaca feed, and other issues addressed in his deposition.

- Leo Eldridge:  Testimony regarding damage from salinomycin, mixing errors, death of alpacas due to salinomycin-adulterated feed, after-effects of salinomycin

poisoning, ionophore-free plants, amount of salinomycin in the feed, lack of studies, vitamin E supplement purpose and design, decision to not use ionophores in plants producing horse feed, Dr. Anderson's study proposal, and other issues addressed in his deposition.

- Jerry Forstner: Testimony regarding the alpaca industry and Magical Farms' operations, sales and history generally, the facts surrounding the death and injury to Plaintiffs' animals, symptoms of same, ownership of same, treatment of same, interactions with representatives of Defendants, impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Jeff Farley: Testimony regarding the alpaca industry and Majestic Meadows' operations and history generally, the facts surrounding the death and injury to Plaintiffs' animals, symptoms of same, ownership of same, treatment of same, value of same, interactions with representatives of Defendants, impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Tyler Forstner: Testimony regarding Magical Farms' operations, the facts surrounding the death and injury to Plaintiffs' animals, location of same, symptoms of same, ownership of same, treatment of same.

- Matthew Best: Testimony regarding Magical Farms' feeding and alpaca care operations, the facts surrounding the death and injury to Plaintiffs' animals, location of same.

- Denise Stoll: Facts surrounding the death and injury to Plaintiffs' animals and her role in treating animals and processing animals (live and dead) at the time, facts and opinions of the injuries to Plaintiffs' animals, including causation and the fact and extent of damage, toxicity of salinomycin, and all other topics addressed by her expert reports and in her deposition.

- David Anderson: Facts surrounding the death and injury to Plaintiffs' animals and her role in treating animals and processing animals (live and dead) at the time, facts and opinions of the injuries to Plaintiffs' animals, including causation and the fact and extent of damage, inability to determine extent of damage or to certify as healthy, toxicity of salinomycin, and all other topics addressed by his report and deposition.

- Michael Safley: Testimony regarding the alpaca industry, alpaca valuation, alpaca judging, alpaca fleece, valuation of Plaintiffs' animals before and after poisoning, impact on market value from an animal consuming salinomycin-tainted feed, Magical Farms' operations and position as an elite breeder, Majestic Meadows' operations and position in the industry, the quality of Plaintiffs' animals and breeding program, Majestic's farm losses due to the poisoning, impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals and other issues addressed in his reports and in his deposition.

- Faye Farley: Testimony regarding the alpaca industry and Majestic Meadows' operations and history generally, the facts surrounding the death and injury to Plaintiffs' animals, symptoms of same, ownership of same, treatment of same,

value of same, interactions with representatives of Defendants, impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Tripp Forstner:  Testimony regarding the alpaca industry and Magical's operations, sales and history generally, the nature of the alpaca market, factors influencing alpaca buyers and sales, the facts surrounding the death and injury to Plaintiffs' animals, symptoms of same, ownership of same, treatment of same, value of same, interactions with representatives of Defendants, impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Libby Forstner:  Testimony regarding the alpaca industry and Magical's operations, sales and history generally, the nature of the alpaca market, factors influencing alpaca buyers and sales, the facts surrounding the death and injury to Plaintiffs' animals, symptoms of same, ownership of same, treatment of same, value of same, interactions with representatives of Defendants, impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- John Pinkowski:  Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Tev Isakov: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Linda Ross: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Amy McCroskie: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Jim or Nancy Stepp: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- David or Nancy TenHulzen: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Sheri or Von Dickerhoff: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Michael Harnett: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Loyd or Shirley Shockey: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry,

reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Craig or Daphne Aurness: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Mary Hazelton: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Debbie Shockey: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

- Vince Conkey: Ownership/assignment of alpacas at issue, the alpaca market, the impact of animals consuming salinomycin in the alpaca industry, reluctance of buyers to purchase tainted animals, reasons for refusing to sell damaged animals.

**V.      Exhibits.**

Plaintiffs' exhibit list is being separately filed contemporaneously with this Trial Brief because of its size, and it is expressly incorporated herein by reference.  (ECF #344.)  Should the Court require a copy of this brief with the exhibit list actually set forth herein in its entirety, Plaintiffs will gladly provide such a document to the Corut.

Plaintiffs reserve the right to add to same with demonstrative exhibits and documents previously disclosed by the parties and third-parties during discovery.

## VI.    Evidentiary Issues.

### A.    Standard for medical testimony.

It is clear that the standard for expert medical testimony in a medical malpractice trial in Ohio is probability. *Stinson v. England*, 69 Ohio St.3d 451, 455, 633 N.E.2d 532, 537; *Warner v. Estate of Jennie B. Hastings*, No. 92-CA-22, 1993 WL 55952 (Ct. App. Ohio Mar. 4, 1993) (citing *Cooper v. Sisters of Charity* (1971), 27 Ohio St.2d 242, 272 N.E.2d 97, overruled as to another holding by *Roberts v. Ohio Permanente Med. Group, Inc.*, 76 Ohio St.3d 483, 668 N.E.2d 480, 1996-Ohio-375 (1996)).    This probability standard has also been applied to negligence cases.    *Drew v. Industrial Commission of Ohio*, 136 Ohio St. 499, 501 (1940); *Shumaker v. Oliver B. Cannon and Sons, Inc.*, 28 Ohio St.3d 367 (1986) (cited in *Warner*). There is no special combination of words, rubric or formula in which the opinion of probability must be expressed.

> The *Shumaker* court, in its analysis of expert testimony, did not hold that there were magic words for establishing probability. Instead the court restated that the probability standard that probability is a concept of "more likely than not," which the expert must establish. *Shumaker, supra* at 369.

*Warner, supra*, at 2.

In *Cooper*, the Ohio Supreme Court recognized probability as more than fifty percent likely. *Cooper v. Sisters of Charity, supra*, 27 Ohio St.2d at 242, 253. This recognition of a simple "greater than fifty percent" requirement was again restated by the Ohio Supreme Court in *Stinson v. England*, 69 Ohio St.3d at 455, 633 N.E.2d at 537.

### B.    Owners able to testify as to value.

Plaintiffs have previously asserted that Ohio law permits owners to testify as to the value of their property. Defendants had not challenged that correct assertion of Ohio law. It appears that Defendants may have changed their position on this issue.

### C.    Owners able to testify on causation.

Federal and state courts, including at least one Ohio court, have held that plaintiffs in lawsuits involving injuries to animals due to poisoning do not need to present actual scientific evidence linking the poison to such injuries, if a jury can reasonably infer causation from other evidence, including opinion testimony from lay persons who witnessed the poisoning. *See, e.g., Zedeker v. Logan Farm Bureau Cooperative Assoc., et al.*, No. 8-83-24, 1985 WL 9095 (Ct. App. Ohio March 18, 1985)(App. A); *see also Swift & Co. v. Morgan & Sturdivant*, 214 F.2d 115 (5th Cir. 1954); *Western Feed Co. v. B.D. Heidloff*, 370 P.2d 612, 230 Or. 324 (Ct. App. Or. 1962); *Haberer v. Moorman Mfg. Co., et al.*, 94 N.E.2d 611, 341 Ill. App. 521 (Ct. App. Ill. 1950).

In *Zedeker  v. Logan Farm Bureau Cooperative Assoc., et al.*, No. 8-83-24, 1985 WL 9095 (Ct. App. Ohio Mar.18, 1985), Plaintiff, Charles Zedeker Jr. ("Zedeker") purchased feed grain mixed by Defendant, Provico Service Center and sold by Defendant, Landmark, Inc. (Provico Service Center and Landmark, Inc. collectively, "Defendants"). *Zedeker  v. Logan Farm Bureau Cooperative Assoc. et al.*, No. 8-83-24, 1985 WL 9095 *1 (Ct. App. Ohio Mar. 18, 1985). Zedeker's animals became ill or died after ingesting Defendants' feed grain and Zedeker brought a product liability claim against them. *Id.*, at *2.

At trial, Zedeker presented evidence that he fed some of his animals Defendants' feed grain and, after such feeding, his animals became ill or died. *Id.*, at *3. Zedeker also presented evidence demonstrating that animals fed with different feed grain did not become ill or die. *Id.*, at 3. Furthermore, Zedeker presented evidence from a veterinarian who concluded that, based upon the above facts, Zedeker's animals became sick after ingesting Defendants' feed grain. *Id.*, at *4. Defendants moved the trial court for directed verdict because of a lack of evidence on the

actual existence of a contaminant or poisonous material in the feed supplement or laboratory analysis on such feed, which the trial court granted.

Zedeker appealed and, in reversing the trial court's directed verdict, the Court of Appeals of Ohio for the Third Appellate District stated:

> Here the problem centers upon the use of reasonable inference. There is no direct positive evidence as to the actual existence of a contaminant or poisonous material in the feed corn or feed supplement sold to the plaintiff. There is no laboratory analysis chemically isolating such element. However, the plaintiff's case is based upon a series of inferences from other facts as to which positive testimony existed.
>
> **First, there was testimony that, on the day subsequent to the date the feed was prepared and placed in feeders, those animals to which the corn was fed became, to varying degrees, ill. (Tr. 42).**
>
> **Second there was testimony that other animals which were in generally similar circumstances but were not fed this feed did not become ill. (Tr. 44).**
>
> **From these two essentially positive facts, a reasonable inference may be drawn that the sudden appearance of the illness was caused by the feed although the exact contaminant is not identified.**
>
> \* \* \* \*
>
> There was further testimony from a veterinarian to much of the same effect. (Tr. 91). "The pigs that were not fed the corn and supplement mixture that Mr. Zedeker had mixed up did not get sick." Again at (Tr. 93). . . . "[t]he market hogs, the two or three pens that were not fed the feed in question did not get sick at all" . . . "[t]o the best of my knowledge, I would have to conclude that the pigs and hogs were sick from something they received in their feed."
>
> It is clear from this evidence that substantial reasonable inferences could be drawn in favor of the plaintiff from the positive evidence presented from which a reasonable mind could conclude there was a contaminating element, **identified only as its effect**, in the corn feed mixture which was the effective proximate cause of the sickness in the animals. *Id.* at \*3—\*4. (Emphasis added).

In *Swift & Co. v. Morgan & Sturdivant*, 214 F.2d 115 (5th Cir. 1954), Plaintiffs, Morgan and Sturdivant brought a negligence lawsuit against Defendant, Swift & Company ("Swift") when their herd of dairy cows was injured after ingesting Swift's poisoned cotton seed meal.

*Swift & Co.*, 214 F.2d, at 116—119. A jury awarded damages to Morgan and Sturdivant based,

in part, upon opinion evidence presented by lay witnesses who handled the injured cattle. *Id.,* at

118—119. In affirming the jury's verdict, the United States Court of Appeals for the Fifth

Circuit stated:

> The appellant contends that the court erred in failing to exclude certain opinion evidence of expert and lay witnesses who in substance were permitted to testify that in their opinion the cotton seed meal processed by appellant and used by the appellees in their feed mixture was the cause of such cows becoming sick. In support of this contention it is argued that in admitting this opinion evidence the trial court allowed the various witnesses to invade the province of the jury by expressing an opinion upon the ultimate fact which was to be passed upon by the jury. We do not at all agree.

> \* \* \* \*

> The rules applicable in respect to evidence on diseases and conditions of animals is as stated in <u>20 Am.Jur., Evidence, § 815</u>, page 685:

>> Diseases and Conditions of Animals.- The fact that the care of animals is generally in the hands of practical men rather than professional men renders it necessary, when considering the admissibility of opinion testimony regarding diseases and the physical conditions or care of animals, to apply a much lower standard of qualification to witnesses giving opinion testimony on such matters than is applied to expert witnesses offering testimony as to the diseases or physical conditions of human beings. **Persons who have habitually had the care of horses cattle, dogs, and other domestic animals may testify as to their soundness or the disease which they have or to the cause of their death, as, for example, whether a horse died of fright or of some latent disease. A person need not be a veterinary to testify to such matters, although the testimony of the latter upon a subject of this character is clearly admissible.** One having had previous experience as a veterinarian in general practice and experience in treating or examining cattle affected with arsenic poisoning is competent to give an opinion that cattle which he treated were affected with arsenic poisoning.

> See also <u>32 C.J.S.,Evidence, § 524</u>, page 222 which is to the same effect.

> \* \* \* \*

In the case at bar the lay witnesses were dairymen experienced in the handling of

cattle. They brought [sic] cotton weed [sic] meal processed by defendant that was

off color and had a burnt odor, they fed this meal to their cattle in the same quantity and in the same feed mixture they had been feeding all the while.

Prior to feeding this meal the cows were healthy but after eating the meal they became ill and manifested particular symptoms, and the cattle which did not eat any of the meal did not develop such symptoms. When the feeding of this off color meal was discontinued and other meal substituted therefor in the same formula none of their cattle thereafter suffered a similar illness. These are some of the facts and circumstances upon which the lay witnesses based their opinions. We think that the court below properly ruled that the opinion evidence was admissible. (Emphasis added).

*Accord, Western Feed Co. v. B.D. Heidloff,* 370 P.2d 612, 617, 230 Or. 324, 334 (Ct. App. Or. 1962)("in view of the fact that the care of livestock is generally in the hands of laymen, courts will usually accept opinion evidence concerning the physical condition of animals from lay individuals who can testify to their practical experience in animal husbandry. It is generally held that an experienced layman who has observed sickness in livestock following consumption of a particular feed or other substance may testify that the feed was its cause").

In *Haberer v. Moorman Mfg. Co. et al.*, 94 N.E.2d 611, 341 Ill. App. 521 (Ct. App. Ill. 1950), Plaintiff, Raymond Haberer's ("Haberer") sheep became ill or died after ingesting Defendant, Moorman Manufacturing Company's ("Moorman") medicine. *Haberer,* 94 N.E.2d at 612, 341 Ill. App., at 523—524.

Haberer brought suit against Moorman and the trial court found in favor of Haberer, even though he failed to present any evidence medically connecting his sheep's injuries to Moorman's medicine. In affirming the trial court's entering a verdict in favor of Haberer, the Court of Appeals of Illinois stated:

There was also evidence that the sheep were in good health prior to administering the worm medicine, and evidence of the death or the illness of the sheep thereafter was competent to establish that such death or impairment of health resulted from the administration of the medicine. Weil-Kalter Mfg. Co. v. Industrial Commission, 376 Ill. 48, 55, 32 N.E.2d 889. The administration of the medicine at least aggravated a pre-existing condition of the sheep, even on

defendants' theory, and that in itself would be sufficient to support a verdict. <u>Olin Industries, Inc., v. Industrial Commission, 394 Ill. 593, 69 N.E.2d 305.</u>

**It is not necessary that a causal connection be shown by medical testimony between the occurrence complained of and the injury or illness where it is clearly apparent from the illness itself and the circumstances attending it.** <u>Patargias v. Coca-Cola Bottling Co., 332 Ill.App. 117, 74 N.E.2d 162;</u> *526 <u>Duval v. Coca-Cola Bottling Co., 329 Ill.App. 290, 295, 68 N.E.2d 479.</u> The evidence disclosed that the group of sheep, which included 400 in all, were divided purely by chance and not by any specific selection and simply by walking through the flock; and that the sheep which were taken by the plaintiff became ill after they were treated with the product of defendant Company and those which were taken by the other buyer, George Ethridge, did not become ill. This circumstance could well have been considered by the jury in arriving at their verdict. (Emphasis added).

Plaintiffs intend to present numerous witnesses to testify as to the facts concerning the symptoms shown by their "affected" animals—symptoms that were identical to those suffered by their less fortunate alpaca brethren that succumbed to LOL's poisonous feed. The fact that the affected animals were fed in the same pastures and were suffering from these same symptoms is highly probative of causation, and under Ohio law Plaintiffs' representatives may opine as to causation based on these facts.

## VII.    Estimated length of trial.

Plaintiffs believe that the trial will last approximately three weeks.


/s/ Robert J. Valerian
Robert J. Valerian (0001533)
Douglas V. Bartman (0073103)
Philip R. Bautista (0073272)
Kahn Kleinman, LPA
1301 East Ninth Street
2600 Tower at Erieview
Cleveland, OH  44114-1824
(216) 696-3311 (Phone)
(216) 623-4912 (Fax)
rjvalerian@kahnkleinman.com
dbartman@kahnkleinman.com
pbautista@kahnkleinman.com
*Attorneys for Plaintiffs, Magical Farms, Inc.*
*and Majestic Meadows Alpacas, Inc.*

## Certificate of Service

I hereby certify that on February 26, 2007, a copy of the foregoing Trial Brief was filed electronically upon all parties. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Robert J. Valerian
*One of the Attorneys for Plaintiffs, Magical Farms,*
*Inc. and Majestic Meadows Alpacas, Inc.*